UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

ASHOK JHA,

                    Plaintiff,

         -against-

BGC FINANCIAL, INC., DANIEL LAVECCHIA,
AND COSME MONOT

                    Defendants.
---------------------------------------------------------------x

10 CIV 5238

10 Civ. _____

**COMPLAINT /
DEMAND FOR JURY TRIAL**

        Plaintiff Ashok Jha, by his attorneys Emery Celli Brinckerhoff & Abady LLP, for

his Complaint alleges as follows:

### PRELIMINARY STATEMENT

    1.      Plaintiff Ashok Jha is a highly qualified, experienced, and successful financial

analyst.  His accomplishments led BGC Financial, Inc., which is affiliated with Cantor

Fitzgerald, to recruit him and move him and his family down to New York from Cantor

Fitzgerald's Toronto office, where he had built a successful brokerage desk.

    2.      Upon joining BGC Financial's New York office, Mr. Jha, who is of South Asian

descent and brown-skinned, learned that he was one of only a handful of racial minorities in an

over 200 person trading floor, and the only racial minority in a senior supervisory position.

Nevertheless, Mr. Jha focused on his work and excelled, until BGC Financial hired Cosme

Monot, a virulent racist.

    3.      Over the next several weeks, Monot publicly and repeatedly called Mr. Jha racial

epithets, including but not limited to "f--king Paki," told him that East Asians were supposed to

be subservient, and otherwise humiliated him, including by screaming at him, denying him

bathroom breaks, and attempting to sabotage his relationships with clients.  Monot engaged in

1

these behaviors at all times of day, in full view of the trading floor, and once, in front of a client.
Mr. Jha repeatedly complained of this degrading treatment to his supervisor, Daniel LaVecchia,
who had played an instrumental role in recruiting Mr. Jha to New York.   But instead of stopping
the harassment, or even simply acknowledging that it was unacceptable, LaVecchia and BGC
Financial effectively told Mr. Jha to be quiet and allow Monot to do his job.  When, after weeks
of humiliating and degrading treatment, Mr. Jha finally refused to accept a particularly brutal
episode of harassment, it was he who was terminated, and not Monot.

  4.  This action arises from Defendants' unlawful behavior and seeks redress for the
harms caused by their abusive, degrading, retaliatory, and shameful conduct.

## THE PARTIES

  5.  Plaintiff Ashok Jha is of South Asian origin and resides in Manhattan.  At all
times relevant herein, Mr. Jha was a citizen of Canada.

  6.  On information and belief, Defendant BGC Financial, Inc., also known as BGC
Partners, Cantor Fitzgerald, ("BGC") is a multinational financial brokerage firm.  On
information and belief, it is incorporated in New York and has its principal place of business at
One Seaport Plaza New York, New York 10038.

  7.  Defendant Daniel M. LaVecchia, was, at all relevant times, the Executive
Managing Director of BGC's operations in North America.  On information and belief, he is a
citizen of the United States and a resident of New York.

  8.  Defendant Cosme Monot was, at all relevant times, a senior vice president of
BGC and resident of New York.

## JURISDICTION AND VENUE

9.      This action arises under 42 U.S.C. § 1981; under the New York City Charter and Code § 8-107; and under § 296 of New York's Executive Law.

10.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343, 1367(a), and the doctrine of supplemental jurisdiction.

11.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b) because events giving rise to Mr. Jha's claims occurred in this district.

## JURY DEMAND

12.     Plaintiff demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

13.     Mr. Jha graduated from the University of Toronto with a bachelor's degree in economics, and was qualified as a chartered financial analyst ("CFA qualified").

14.     From 1997 until early 2004, Mr. Jha worked at the Toronto office of Cantor Fitzgerald.  Prior to joining Cantor Fitzgerald, Mr. Jha had worked at several other finance companies.

15.     Over the course of his years in the Toronto office, Mr. Jha developed a lucrative desk in the field of index equities derivatives, which earned Cantor Fitzgerald significant profits.

16.     Based on his success, the New York office of BGC began to recruit Mr. Jha to build its own equities index derivatives desk.  Defendant Daniel M. LaVecchia, the Executive Managing Director of BGC's operations in North America, was heavily involved with Mr. Jha's recruitment.

17.     Mr. Jha was reluctant to leave the Toronto office, where he had built a top equities index derivatives desk.  Nonetheless, after heavy recruitment from the New York office

of BGC, he ultimately agreed to leave Canada and relocate his family to Manhattan. In October 2004, Mr. Jha joined the New York office of BGC, as the head of the Index Equities Derivative Desk.

18.     Upon arriving at BGC, Mr. Jha observed that he was one of a token number of non-whites, and that the BGC tolerated and encouraged discrimination throughout the office. For instance, BGC employees openly spoke derogatorily of women's body parts and of sexual exploits with women, and encouraged employees to take clients to strip clubs.

19.     Upon arriving at BGC, Mr. Jha also learned that his job was not what he had expected it to be. He was told to do fixed income corporate work as well as to run the equities index derivative desk, for which he had been hired. He was also not given the strong supporting staff he had been promised.

20.     Although his position was not what he had expected, and although BGC was a virtually all-white male enclave, Mr. Jha focused on his work and sought to excel.

21.     In April 2008, Mr. Jha was informed by Defendant LaVecchia that LaVecchia was planning on hiring Cosme Monot to replace Mr. Jha as the head of the Index Equities Derivatives Desk, because Monot had promised to bring in a major client. The Executive Managing Director of BGC also promised Mr. Jha that he would return as head of the desk after Defendant Monot's contract expired in one year.

22.     Once Defendant Monot began at BGC, Defendant LaVecchia made it clear to Mr. Jha that BGC valued Monot's business contacts above everything else, and that Mr. Jha was not to do anything other than support Monot in running the Index Equities Derivatives Desk. Mr. Jha understood that his own base responsibilities and compensation would not change, and accepted the opportunity for growth that this new connection could bring.

23.    Monot joined BGC in or around April 2008, and he immediately began making racist remarks to Mr. Jha.  During his first two weeks at BGC, Monot called Mr. Jha a "f--king Paki" over 10-12 times.  He also referred Mr. Jha by other derogatory names, such as "curry boy."

24.    Monot made these offensive and derogatory remarks on the trading floor in front of Mr. Jha's virtually all-white co-workers, who never protested against his use of racial epithets.  Monot once also called Mr. Jha a "f--king Paki," in front of a client.

25.    In addition to verbal harassment, Monot engaged in other forms of harassment designed to humiliate Mr. Jha.  Monot refused to allow Mr. Jha to take routine bathroom or other breaks.  When Mr. Jha stood up to use the bathroom, Monot yelled at him to "sit the f--k down."

26.    Monot also invaded Mr. Jha's workspace and read information from Mr. Jha's personal Bloomberg Terminal, where Monot could review all of the records of financial transactions Mr. Jha had made during the day.   He also sent messages from Mr. Jha's Bloomberg Terminal, posing as Mr. Jha, without Mr. Jha's permission.

27.    Monot also tried to restrict Mr. Jha's contacts with important clients, and told him to allow other, more junior members of the desk to field certain calls, including with clients that Mr. Jha had developed.

28.    Monot did this in front of and in full view of the others on the trading floor.  Monot never treated any of Mr. Jha's virtually all-white co-workers a similar way.  None of Mr. Jha's co-workers protested against Monot's virulent racism, or took any effort to address the harassment.

29.    Mr. Jha reported Monot's behavior to Defendant LaVecchia, who was his supervisor at the time, shortly after it began.  In sum and substance, Defendant LaVecchia told

Mr. Jha to ignore Monot and to let Monot run the Equities Index Derivative Desk without interference. Defendant LaVecchia also implied that Mr. Jha had no right to complain, because he had tacitly consented to this type of behavior by agreeing to allow Defendant Monot to run the Desk. Defendant LaVecchia never indicated that he would speak to Monot about his racist actions, nor did he indicate that Monot's actions were inappropriate. Defendant Levvechia sent Mr. Jha the clear signal that BGC did not care about racial discrimination and harassment, so long as Monot could continue to earn money for BGC.

30.     Pressured by Defendant LaVecchia, and seeing that no one at BGC had any interest in addressing this outrageous and overtly racist behavior, Mr. Jha attempted to ignore Monot's ongoing harassment and to continue to do his work. When Monot told him to "sit the f--k down," when he tried to go to the bathroom, he sat down. When Monot called him a "f--king Paki," he tried to ignore it.

31.     When Mr. Jha did occasionally protest against Monot's ongoing discrimination to Monot himself, Monot responded, in sum and substance, "I thought East Asians were docile, I'm surprised." He also told Mr. Jha that "you people are supposed to be very compliant."

32.     After about two weeks of this constant harassment, Mr. Jha met with Defendant LaVechia, and again reminded him of Monot's harassing behavior. Defendant LeVecchia responded that he would "take care of it," but reiterated to Mr. Jha the importance of letting Monot do his job.

33.     Over the next three weeks, Monot stopped the overt racist name-calling, but continued the targeted discrimination and harassing behavior. He continued to tell Mr. Jha to "sit the f--k down," when he wanted to take a routine break or go to the bathroom, conduct Monot did not appear to direct at white individuals on the desk.

34.     Mr. Jha continued to do his best to ignore Monot's ongoing harassment.

35.     On Friday, May 2, 2008, Monot's harassment of Mr. Jha reached the point where he could no longer tolerate Monot's behavior.  Shortly after Mr. Jha completed a major deal, Monot asked Mr. Jha to call back the buyer, and to incorrectly tell the buyer that the deal had not gone through.  Monot was fully aware that the deal had been finalized, but wanted to lie to the buyer because he believed he could get a higher price.

36.     Mr. Jha believed what Monot was asking him to do was illegal, and he refused to comply with his demands.

37.     Monot began screaming at Mr. Jha, and smashed his bottle of water right in front of Mr. Jha.

38.     Mr. Jha was appalled that Monot not only failed to recognize the value of the major deal that he had just completed, but in fact sought to sabotage it.  He was also shocked at Monot's physical display of violence.  He called Monot crazy and told him that he would longer tolerate his behavior.

39.     Mr. Jha went outside to take a break, and when he retuned shortly afterward, Monot immediately told him that Defendant LaVecchia wanted to see him.

40.     Shortly afterward, Defendant LaVecchia himself called Mr. Jha and requested that he come see him.  On information and belief, Defendant LaVecchia never requested a similar meeting with Monot.

41.     When Mr. Jha met with Defendant LaVecchia, Defendant LaVecchia told Mr. Jha to take a long weekend and to leave work.  Defendant LaVecchia never told Mr. Jha that Monot's conduct was unacceptable, nor did he give any indication that BGC would take steps to address or even in any way examine or investigate Monot's harassing behavior.

42.     After complaining about the racial discrimination perpetrated by BGC, Mr. Jha was terminated from his position at the Index Equities Derivatives Desk.  Defendant BGC made a cursory attempt to retain Mr. Jha in a completely different capacity, at a level of compensation that was less than a person of his seniority and experience was entitled to receive, and that was less than what he had previously received.  Mr. Jha understood BGC's efforts as a retaliatory demotion for having refused to accept Cosme's continued racism, and as a way to force him out of BGC.  Meanwhile, Monot was retained as the head of the Index Equities Derivatives Desk.  Ultimately, even the minimal "effort" that was purportedly being made to place Mr. Jha in a lesser position was halted when Defendant BGC deliberately changed a material term of its offer that Mr. Jha had told them would certainly be unacceptable.

43.     As a result of the racially abusive and hostile work environment at BGC's New York office, Defendants' retaliation against him when he refused to accept this harassment, and Defendants' termination of Mr. Jha, Mr. Jha has suffered emotional and economic damages.

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1981
### Interference with Working Conditions on the Basis of Race
### (Against All Defendants)

44.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

45.     Plaintiff, a South-Asian employee with brown skin, was subjected to a hostile working environment, which was open and notorious, on the basis of his race and national origin, generated by Defendant Monot and about which Defendants LaVecchia and BGC knew or should have known.

46.     Defendants interfered with Plaintiff's working conditions and terminated him for his refusal to tolerate a hostile work environment.

47.    By reasons of the foregoing, Defendants violated 42 U.S.C. § 1981 by depriving Mr. Jha of the same right to make and enforce contracts and of the full and equal benefit of all laws enjoyed by white citizens.

48.    Defendants LaVecchia and Monot were personally involved with the above discrimination.

49.    Defendants acted willfully, knowingly, and with the specific intent to deprive plaintiff of his rights, remedies, privileges and immunities guaranteed by § 1981.

50.    As a direct and proximate result of the discrimination detailed above, plaintiff sustained damages hereinbefore alleged.

## SECOND CLAIM FOR RELIEF
### N.Y. City Admin. Code § 8-107
### Discrimination on the Basis of National Origin/Race
### (Against All Defendants)

51.    Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

52.    At all times relevant hereto, Defendant BGC had at least four persons in its employ and therefore it and its agents and employees were required to comply with the Civil Rights Laws of the City of New York, including N.Y. City Admin. Code § 8-107.

53.    N.Y. City Admin. Code § 8-107(1)(a) prohibits employers from discriminating against an employee because of race "in compensation or in terms, conditions or privileges of employment."

54.    The racially hostile work environment at the Manhattan BGC office was sufficiently severe and pervasive to alter the terms and conditions of Mr. Jha's employment and create an abusive working environment in violation of N.Y. City Admin. Code § 8-107(1).

55.     The hostile work environment, threats and harassment based on Mr. Jha's race and national origin was sufficiently severe and pervasive to alter the terms and conditions of Mr. Jha's employment and create an abusive working environment in violation of N.Y. City Admin. Code § 8-107(1).

56.     Said discrimination, failure to accommodate, and retaliation occurred with malice and reckless disregard of the Plaintiff's rights.

57.     As a direct and proximate result of this discrimination, Mr. Jha suffered and continues to suffer actual damages, in forms including but not limited to lost income, lost future earnings, mental anguish, and embarrassment.

## THIRD CLAIM FOR RELIEF
### N.Y. Executive Law 296
### Discrimination on the Basis of National Origin/Race
### (Against All Defendants)

58.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

59.     At all times relevant hereto, Defendant BGC had at least four persons in its employ and therefore it and its agents and employees were required to comply with the Civil Rights Laws of the State of New York, including N.Y. Executive Law 296.

60.     N.Y. Exec. Law 296(1)(a) prohibits employers from discriminating against an employee because of race, color, or national origin "in compensation or in terms, conditions or privileges of employment."

61.     N.Y. Exec. Law 296(6) also provides that it is an "unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden in this chapter, or attempt to do so."

62.     Defendants violated N.Y. Exec. Law 296(1) and 296(6) by refusing to address plaintiff's complaints about racial harassment, by urging him to ignore the harassment, and by ultimately constructively discharging him.

63.     Said discrimination occurred with malice and reckless disregard of the plaintiff's rights.

64.     As a direct and proximate result of this discrimination, Mr. Jha suffered and continues to suffer actual damages, including but not limited to lost income, lost future earnings, mental anguish, and embarrassment.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1981**
**Retaliation**
**(Against All Defendants)**

65.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

66.     As set forth above, by, among other things, protesting conduct that violated 42 U.S.C. § 1981, reporting racial harassment and race discrimination to his superior, Defendant LaVecchia, and asserting rights protected under 42 U.S.C. § 1981, Plaintiff engaged in protected activities that were known to defendants.

67.     Motivated by an intent to punish Plaintiff for his protected activities, defendants took numerous employment actions disadvantaging Plaintiff, including, without limitation, terminating Plaintiff when he complained about discrimination.

68.     By retaliating against Plaintiff because he opposed practices made unlawful by 42 U.S.C. § 1981, defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed under 42 U.S.C. § 1981.

69.     As a direct and proximate result of this discrimination, Mr. Jha suffered and continues to suffer actual damages, including but not limited to lost income, lost future earnings, mental anguish, and embarrassment.

## FIFTH CLAIM FOR RELIEF
### N.Y. City Admin. Code § 8-107
### Retaliation
### (Against All Defendants)

70.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein.

71.     N.Y. City Admin. Code. § 8-107(7) prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter."

72.     As set forth above, by, among other things, complaining about and opposing unlawful employment practices including harassment and discrimination, and by reporting the harassment and discrimination to his superiors, Plaintiff engaged in protected activities that were known to defendants.

73.     Motivated by an intent to punish Plaintiff for his protected activities, defendants took numerous employment actions disadvantaging Plaintiff, including without limitation, terminating Plaintiff when he complained about his discriminatory treatment.

74.     By retaliating and discriminating against Plaintiff because he opposed practices made unlawful by the New York State Human Rights Law, defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed under the New York City Administrative Code § 8-101 et seq , in violation of New York City Administrative Code § 8-107[7].

75.     As a direct and proximate result of this discrimination, Mr. Jha suffered and continues to suffer actual damages, including but not limited to lost income, lost future earnings, mental anguish, and embarrassment.

### SIXTH CLAIM FOR RELIEF
**N.Y. Executive Law 296**
**Discrimination on the Basis of National Origin/Race**
**(Against All Defendants)**

76.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth herein..

77.     N.Y. Exec. Law 296(7) prohibits employers from retaliating against any person "because he or she has opposed any practices forbidden under this article."

78.     As set forth above, by, among other things, complaining about and opposing unlawful employment practices including harassment and discrimination, and by reporting the harassment and discrimination to his superiors, Plaintiff engaged in protected activities that were known to defendants.

79.     Motivated by an intent to punish Plaintiff for his protected activities, defendants took numerous employment actions disadvantaging Plaintiff, including without limitation, terminating Plaintiff when he complained about his discriminatory treatment.

80.     By retaliating and discriminating against Plaintiff because he opposed practices made unlawful by the New York State Executive Law, defendants deprived Plaintiff of rights, remedies, privileges and immunities guaranteed under the New York State Executive Law in violation of New York State Executive Law 296(7).

81.     As a direct and proximate result of this discrimination, Mr. Jha suffered and continues to suffer actual damages, including but not limited to lost income, lost future earnings, mental anguish, and embarrassment.

WHEREFORE, plaintiff respectfully requests judgment against Defendant as follows:

(A)     an order awarding compensatory damages in an amount to be determined at trial;

(B)     an order awarding punitive damages in an amount to be determined at trial;

(C)     reasonable attorneys' fees and costs under 42 U.S.C. § 1981a(a)(1), (b); § 2000e- 5(k); N.Y.C. Admin. Code § 8-502; and

(D)     directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs and disbursements of this action.

Dated: July 9, 2010
      New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        & ABADY LLP

                                  By: _____
                                      Mariann Meier Wang (MW 7417)
                                      Eisha Jain  (EJ 5057)
                                      75 Rockefeller Plaza, 20th Floor
                                      New York, New York 10019
                                      (212) 763-5000

                                    *Attorneys for Plaintiff*